Rose, J.,
dissenting:
This case is an example of how those in our society who suffer serious mental illness are treated when they find their way into our criminal justice system. All too often, we warehouse them for lengthy sentences in an already crowded prison system. Rather than consider Tanksley’s documented mental illness as mitigation in his sentence, the district judge apparently held it, and the conduct it produced, against him.
When arraigned, counsel had serious doubts about Tanksley’s competence to stand trial. Tanksley’s history showed prior hospitalization for delusional disorder or paranoid schizophrenia, which included two years in the Nevada State Prison’s mental unit, and treatment with psychotropic medication.
The district ¿ourt appointed a sanity commission to assess Tanksley’s ability to stand trial and ordered Tanksley sent to Lakes Crossing for observation and evaluation. Three doctors examined him as part of the sanity commission. Two of these doctors had participated in Tanksley’s sanity evaluation involving another case in Washoe County. At a hearing on the results of Tanksley’s evaluation, all three doctors opined that he was suffering from delusional disorders. One diagnosed Tanksley with paranoid schizophrenia. Initially, when asked about their conclusions regarding Tanksley’s competence to stand trial and to assist in his own defense, all three concluded that he could not participate effectively in his own defense. Upon reconsideration, and based on a telephone conversation with Tanksley, one psychiatrist decided Tanksley was competent, concluding that Tanksley’s failure to assist in his defense was volitional. The second doctor said that Tanksley was competent to understand but could not participate in his own defense. The third doctor was unwilling to say for certain whether Tanksley’s mental state would impair his ability to assist in his own defense because Tanksley refused to meet with him for purposes of the sanity commission.
Tanksley also testified at the hearing of the sanity commission. He failed to provide responsive answers to direct questions; he *851 inferred that his defense would be assisted by many well-known and important public persons and that a child victim of kidnapping was a key figure in his defense. He testified that Nelson Mandela, kidnap victim Jaycee Lee Dugard (the minor victim in a local unsolved kidnapping case), and Ed Pearce, a newsman on local Channel 8 television, would assist him at trial, but he was unwilling to elaborate to his attorneys because they were working against him.
Tanksley was found competent to stand trial by the court at this hearing, but the court noted that Tanksley’s own testimony gave a “delusional viewpoint of his defense, and [would] give a rather constrained defense at best . . . .” Shortly before trial, Tanksley elected to represent himself, and the district judge approved his representation. During jury venire, Tanksley asked the potential jurors:
Have you all heard about Jaycee Lee Dugard, the incident in the newspaper, about her being a witness in this court?
The Black Panther who might know where she is from the Travis T. Hipp Sunday afternoon show?
All right. I have no further questions.
In Tanksley’s opening statement, he indicated that the case involved a kidnapped child. At trial, he continued his themes of raising money to locate or secure the release of Jaycee Lee Dugard and of the conspiracy to hinder this defense.
In Tanksley’s closing statement, he stated that the money he attempted to obtain from the victim was intended to be used for the release of this child, Jaycee Lee Dugard, and he spoke at length regarding evidence he believed was purposefully hidden from him. Tanksley’s conduct at trial seemed to confirm the numerous medical diagnoses of delusional disorders with schizophrenia. His numerous delusions were obvious, and he was very suspicious of the judge and lawyers.
At sentencing, Tanksley argued only that the transcripts of the trial would prove the perjury and conspiracy that had taken place and that no crime had occurred. Also of interest was the court’s statement at sentencing:
The sentences I’m about to impose, I think, are justified by the actions of both defendants, as well as what I regard as an offensive attempt to throw a smoke screen to this Court and to the jury with regard to a child who was unfortunately kidnapped from her parents, ... to try to inject that particular child into the theory of defense for reasons that still escape this Court.
*852 Those reasons seemed clear to the mental health professionals who testified — Tanksley is mentally ill and suffers from delusional disorders with schizophrenia. Tanksley was sentenced to five years for obtaining money under false pretenses and ten years on the extortion count, each count to run consecutive to the other, the maximum sentence that could be imposed.
While awaiting trial, Tanksley set the stuffing in his jail mattress on fire. He was charged with arson and tried for this separate offense after the above-stated sentencing. Tanksley was convicted, adjudged a habitual criminal, and given the maximum sentence of life with the possibility of parole.
Tanksley, a black man with a white wife, came to Carson City and attempted a scam on a local businessman by attempting to give him a bad check for a good one. Before any money changed hands, Tanksley’s deception was discovered. His second crime was to set fire to his jail mattress — a more serious offense because it necessitated evacuating prisoners. But in the broader scheme of things, there was no property loss or personal injury, and I would not classify either offense as a major felony.
Tanksley is a petty thief with a long history of mental illness. Rather than recognize that most of Tanksley’s conduct was driven by his mental condition, the district judge did just the opposite. We now have sentences imposed on a mentally ill person of life imprisonment in the arson case (a minimum of ten actual years must be served before parole eligibility), plus fifteen years of sentences imposed in this case. Nevada must pay to incarcerate this man for about twenty years when no one was hurt nor property lost from conduct primarily the product of mental illness.
This case brings into question the wisdom of this Court’s decision in Sims v. State, 107 Nev. 438, 814 P.2d 63 (1991), where we held that the court will not review any sentence that a district judge could have legally imposed. In dissent with Justice Springer, I stated: “The majority’s failure to do so is an abdication of our responsibility and a refusal to correct an injustice when brought to our attention.” Id. at 442, 814 P.2d at 65. I further stated that “I find it disheartening that the part of the criminal process that has the greatest ultimate effect on the defendant — the imposition of his or her sentence — is the part we decline to review.” Id.
It still seems odd to me that we will review every discretionary act performed by a district court but refuse to scrutinize the sentence imposed in felony crimes. While such review should be conducted with appropriate deference to the district court and reluctantly exercised, the Sims case and the case in question are examples of why such review should be conducted. But, since *853 this court has abdicated its authority to review any sentence that is legally possible to assess, I can only harangue against such a restrictive policy.
I would affirm Tanksley’s conviction but vacate the sentence and remand for a new sentencing hearing before a different district judge.